[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This action for dissolution of marriage and other relief was tried over a period of two and one-half trial days. Both parties were represented by counsel. The parties testified, as did a lay witness, a family services evaluator, and the guardian ad litem of the minor children. Evidence was presented on parenting issues, child support, alimony, division of assets and liabilities, counsel fees, health insurance and life insurance. Numerous exhibits were entered into evidence. The court has considered all of the statutory criteria for the orders to be issued. The statutory criteria will not be restated here.
The parties were married on September 21, 1991. There are three minor children of the marriage: Dana Gabriel Orkin, born June 19, 1993, Mitchell Asher Orkin, born April 1, 1995, and Cassie Doria Orkin, born June 30, 1998. No other children have been born to the plaintiff wife since the date of the marriage. The parties have not been recipients of public assistance during the period of the marriage.
The plaintiff wife, Elyse Carol Orkin, is 39 years old and is in good health. She is a senior consulting analyst of United Risk Assessment and Management. She has been at this job since 1996. Prior to that, and prior to the marriage, she worked at Connecticut Mutual Insurance Company. Her current gross earnings are $1,225 per week. She receives a yearly bonus of about $3,000 and has yearly interest and dividends of about $500.
The defendant husband, Curtis Brian Orkin, is 41 years old and is in good health. He has been an engineer at Kaman Aerospace Corporation since before the marriage. His gross earnings are $1,619 per week. He has yearly interest and dividends of about $100.
The parties own a house at 25 Newport Avenue in West Hartford with a value of $306,000. There is a mortgage with a balance of $65,344. Therefore, the parties have equity of $240,656. The house was purchased by the defendant in May 1988, two months before the parties met. The CT Page 11122 plaintiff moved in with the defendant approximately a year before their marriage when there was approximately $45,000 in equity. Thereafter the plaintiff contributed her earnings (including $34,000 in severance pay received from a former employer) to all household expenses including the house. During the marriage the parties made substantial improvements to the property which added to the value. The house is need of roof repairs which will cost approximately $6,200.
During the marriage the defendant inherited $87,000 from his grandfather and the plaintiff inherited $30,000. Some of these funds were used for the house and other family expenses, and some was deposited in a joint investment account with Fidelity with a present value of $73,400. At the time of the marriage the plaintiff had a car and a few thousand dollars which were spent on the wedding. In addition to the equity in the home the defendant had a car, $3,500 in savings bonds, and $9,300 in IRA's.
The parties have a jointly owned Fidelity portfolio with a value of $73,400, jointly owned savings bonds worth $4,100, and jointly owned Kaman stock worth $180. The defendant has savings bonds in his sole name worth $3,600, Kaman stock in his sole name worth $420, and an American Eagle Credit Union Savings account in his sole name worth $4,900. The plaintiff has a credit union account in her sole name worth $246, and checking and savings accounts in her sole name with minimal balances.
The plaintiff has three retirement accounts: Merrill Lynch Profit Sharing with a value of $13,542, a traditional Fidelity IRA with a value of $31,197, and a Fidelity Roth IRA with a value of $549. The defendant has three retirement accounts: Putnam 401k with a value of $70,700, a Roth IPA with a value of $2,000, and a traditional IRA with a value of $12,700.
The parties each have a vested interest in a pension plan. The plaintiff will receive $712 per month from the Massachusetts Mutual pension plan beginning at age 65. The defendant will receive $1,700 per month from the Kaman pension plan beginning at age 65.
The parties agreed that the marriage has broken down irretrievably. They disagreed about the causes. The evidence is clear that the causes for the breakdown of the marriage revolve around the defendant's anger. The defendant had a hard time controlling his temper in the midst of family life. Although there was no physical violence, he used vulgar and insulting language toward the plaintiff, sometimes in the presence of the children. The defendant does not deny that these angry outbursts occurred. His position is that they were infrequent and were triggered, CT Page 11123 in part, by the plaintiff's lack of affection. Having considered all of the evidence on this issue, the court finds that the defendant must bear the majority of the fault for the breakdown of the marriage.
The most contentious issue in the case was the parenting plan. Surprisingly, the parties agreed that they should share joint legal custody of their three minor children, and they worked out a temporary parenting plan which they followed without major incident during the pendency of this case. But, they vigorously contested the specifics of the final parenting plan at trial. The plaintiff wants to be designated the primary residential parent subject to the defendant's right to visit all three children on alternate weekends and on two weekday evenings. The defendant favors the continuation of the pendente lite arrangement which provided a revolving six week schedule of parenting time for him with one or more of the children without the designation of a primary residential parent. The family relations evaluator recommended a plan which was similar to that proposed by the plaintiff which would expand to include two weekday overnight visits once the defendant can secure suitable housing in the West Hartford area. The guardian ad litem proposed a schedule which was a combination of the proposals of the parties.
It is difficult to say which of the various parenting plans will promote the best interests of the children more than the others. Any of these plans would be workable if the parties were supportive. But, the parties apparently felt that it made sense to spend thousands of dollars to have the court make this decision for them. Having considered all of the evidence, the best interests of the children will be advanced by the a parenting plan proposed by the guardian ad litem. This plan is a bit complicated but does encompass the strong points from the various other plans.
The defendant must pay child support in accordance with he Guidelines. Although the parenting plan will provide the defendant with access to the children which is "substantially in excess of a normal visitation schedule" as defined in Section (h)(4) of the Preamble to the Guidelines, the defendant is not entitled to a deviation. A deviation is warranted only when sufficient funds remain for the parent receiving support to meet the basic needs of the child after the deviation. See, Guidelines Section 46b-215a-3 (b)(6)(A) (ii). Any deviation in this case would not leave the plaintiff with sufficient funds to meet the basic needs of the children.
Although each party argues that he/she is entitled to an unequal division of the assets, the court has weighed all of the relevant criteria and has determined that a roughly equal division of the assets CT Page 11124 is fair and equitable. The value of the automobiles is not included in the calculation.
The court issues the following orders:
1. The marriage is dissolved.
2. The parties shall share joint legal custody of their three minor children. The parties shall share parenting responsibilities in accordance with the Parenting Plan set forth in subsection k below.
 a. The parties shall exert every reasonable effort to maintain a free access and unhampered contact between the children and each of the parties, and to foster a feeling of affection between the children and the other party. Neither party shall do anything which may estrange the children from either of them, or which may hamper the free and natural development of the child's love and respect for the other parent.
 b. The parties shall consult with each other with respect to the children's education and religious training, summer camp and daycare selection, illnesses and operations (except in emergencies), health, welfare and other matters of similar importance affecting the children whose well being, education and development shall, at all times, be the paramount consideration of the parties.
 c. Each parent shall be entitled to complete, detailed information from any pediatrician, general physician, dentist, consultant or specialist attending the children for any reason whatsoever and be furnished with copies of any reports given by the latter to any of them, to the other parent. The parties shall inform each other of any illness, accident or other circumstance seriously affecting the health or welfare of the children. The parent with whom any child is staying at any time shall take responsibility for meeting medical and dental emergencies, and, in any emergency, the permission of both parents shall not be necessary, provided that the parent having the child at the time of such emergency shall notify the other parent as immediately as reasonably possible. Both parents shall provide any caretaker of the children, including but not limited to babysitters, school and camp personnel, with the telephone numbers of both CT Page 11125 parties to be used in case of emergency.
 d. Each parent shall be entitled to complete, detailed information given from any teacher, or school which the children may attend, and to be furnished with copies of all reports given by them, or any of them, to the other.
 e. Day to day decisions of a routine nature, including but not limited to, bedtime, healthcare and day-to-day school, religious, social and athletic activities customary for children of their age and maturity, shall be made by the parent with whom the children are staying at particular times. The parents shall endeavor to cooperate and establish a mutually agreeable policy regarding such day-to-day decisions, but the responsibility for routine decisions shall rest with the parent with whom the children are then staying.
 f. Each parent shall have the right to speak by telephone with the children on a reasonable basis on those days when she/he does not enjoy parenting time with them. Each parent shall keep the other aware of his or her work and home telephone numbers at all times. Each parent shall inform the other of where the minor children are at all times and be provided with a telephone number and address where they may be reached which shall not be utilized in a fashion to interrupt the privacy of the other parent.
 g. The parents shall speak with each other by telephone each week to discuss the children. Unless agreed and arranged at another time, the Father shall call the Mother at her home at 9:00 p.m. on Wednesday evenings.
 h. Each parent shall provide the other with the first opportunity to provide care for the children, in the event that they are unable to care for the children for a significant period of time (six hours) during their regularly scheduled parenting time. Each party shall give the other reasonable notice in the event that she/he is unable to care for the children during their regularly scheduled time. Notwithstanding the above, both parents shall be prepared to make alternate arrangements for the children on occasions when the other parent is not available to care for the children and they are unavailable. If the parent who is informed of the other CT Page 11126 parent's need for childcare does not confirm her/his availability within twenty-four hours, alternate arrangements shall be made. Nothing in this paragraph shall be construed as prohibiting either parent from making plans for their child or children to visit with family members or close friends during their scheduled time.
 i. Neither parent shall schedule or enroll the children in any activity during the other parent's scheduled time without the knowledge and consent of the other parent. Neither shall either parent promise the children that they may participate in an activity before discussing it with the other parent if it may fall on her/his scheduled time.
 j. Neither party may move more than twenty miles from West Hartford, Connecticut without providing the other with ninety. days written notice.
k. Parenting Plan
Vacations:
a. February vacation the children shall be with the Father;
b. April vacation the children shall be with the Mother;
 c. December school vacation shall be defined as the first full day with no school (which may be a Saturday if the last day/partial day of school is a Friday) through New Year's Day. Using that definition, the vacation period shall be divided in half, with the extra day attaching to the first "half' if there are an odd number of days in any given year. Mother shall have the first half in odd numbered years and the last half in even numbered years. Father shall have the first half in even numbered years and the last half in odd numbered years;
d. Summer vacation:
i. The remainder of the last week of school with Father;
 ii. Six to eight weeks of camp/daycare as has been the family's habit. Parents to discuss plans in the spring of each year. Regular weekday and weekend schedule remains;
CT Page 11127
iii. First full week of no camp, children with Mother;
 iv. The partial week prior to the new school year, children with Father;
 v. Each parent may have two weeks (Monday through Friday, to be added to their regularly scheduled weekend) of vacation. These weeks shall be non-consecutive during the summers of 2002 and 2003, and may be consecutive during the summers of 2004 and beyond. Parents to elect their week or weeks by May 1St of each year and provide written/email notice to the other. Mother may have first choice of weeks in even numbered years (in case of conflicting choices) and Father may have first choice of weeks in odd numbered years.
 Holidays: ("odd" indicates odd numbered years; "even" indicates even numbered years. Holidays set forth herein shall take precedence over the regularly scheduled parenting time if they conflict. Monday "single day" holidays not listed below shall extend a parent's weekend. Said weekends will then end at the beginning of school/camp (or 9:00 a.m.) Tuesdays.
a. Passover: (first night): Mother even; Father odd;
b. Passover: (second night): Mother odd; Father even;
 c. Memorial Day weekend: Mother odd; Father even. The parent that does not enjoy this holiday weekend shall have the following weekend and the alternating weekend schedule shall continue from there;
d. Independence Day: Mother even; Father odd;
 e. Labor Day weekend: Mother odd; Father even. The parent that does not enjoy this holiday weekend shall have the following weekend and the alternating weekend schedule shall continue from there;
f. Rosh Hashanah: Mother odd; Father even;
g. Yom Kippur: Mother even; Father odd;
 h. Thanksgiving (defined as Wednesday at 5:00 p.m. until Friday at 5:00 p.m.): Mother even; Father odd;
CT Page 11128
i. Chanukah: Mother odd; Father even.
Weekly Schedule:
The children shall be in the care of the Mother on Mondays and Wednesdays from the start of school/camp (or 9:00 a.m.) until the start of school/camp (or 9:00 a.m.) on Tuesdays and Thursdays.
The children shall be in the care of the Father on Tuesdays from the start of school/camp (or 9:00 a.m.) until Wednesdays at the start of camp/school (or 9:00 a.m.). [Note: this shall not be an overnight if there is school the next day until Father relocates to a home with a dedicated sleeping area and personal space for each of the children. The children would return to the Mother's home at 9:00 p.m.]
The children shall bet with the father Thursdays from the start of school/camp (or 9:00 a.m.) until Friday at the start of school/camp (or 9:00 a.m.). [Note: this shall not be an overnight if there is school the next day until the Father relocates to a home with a dedicated sleeping area and personal space for each of the children. The children would return to the Mother's home at 7:00 p.m.]
The children shall be with the Mother Fridays from the start of school/camp (or 9:00 a.m.) until 5:00 p.m.
The parents shall care for the children from 5:00 p.m. Fridays until 9:00 a.m. Saturdays on an eight week rotating schedule:
Week 1. Mother cares for Cassie; Father cares for Dana Mitchell
Week 2. Mother cares for Dana Mitchell; Father cares for Cassie
Week 3. Mother cares for Dana; Father cares for Cassie Mitchell
Week 4. Mother cares for Mitchell Cassie; Father cares for Dana
Week 5. Mother cares for Mitchell; Father cares for Dana Cassie
Week 6. Mother cares for Dana Cassie; Father cares for Mitchell
Week 7. Mother cares for all children
Week 8. Father cares for all children CT Page 11129
The parent who is not responsible for the children on the weekend shall return the child/children to the other parent at 9:00 a.m. Saturday. If the parent whose weekend is scheduled is going to begin a vacation period, or has plans to go away for the weekend she/he may leave on Friday evening upon reasonable notice to the other parent. In the event that there is no school and the Mother has a plan for the children that would extend beyond 5:00 p.m., the exchange may be at 8:00 p.m. Mother shall give Father at least 24 hours notice of such requested schedule change.
The parents shall each care for all three children on an alternating weekend schedule, from 9:00 a.m. Saturday, until the start of school/camp (or 9:00 a.m.) Monday. [Note: Father's alternating weekends shall not include a Sunday overnight when there is school the next day until he relocates to a home with a dedicated sleeping area and personal space for each of his children. The children would return to the Mother's home at 7:00 p.m. Sunday evening.]
1. The Guardian ad litem shall continue her appointment for a period of six months post judgment. She shall continue to be authorized to speak with the children's therapist.
In the event that the Father does not return to the marital home to reside post judgment, he shall notify the GAL when he obtains housing sufficient to implement the school night, overnight parenting time outlined above. The GAL shall make a home visit and provide the parents and their counsel with a letter detailing her observations.
Should the Mother move to other housing as a result of the orders of the court, the requirements imposed upon the Father (to provide a dedicated sleeping space and personal space for each child) shall apply to her parenting time. Likewise, the GAL shall confirm for the parties and counsel that her new home has appropriate accommodations for school night, overnight parenting time.
The Guardian ad litem shall not be required to obtain her own counsel to file a Motion to Modify the parenting plan if she believes that the circumstances warrant such action.
3. The defendant husband shall pay child support to the plaintiff mother in the amount of $320 per week plus one-half of all daycare expenses including day camp. Child support shall be payable until each minor child attains the age of 18 years, but if still in high school, support shall continue through high school graduation but not beyond the age of 19 years. The defendant is also ordered to pay 38% of the cost of child care/day camp incurred by the plaintiff to maintain her CT Page 11130 employment. The present cost is $280 per week; therefore, the defendant's share is $106 per week and the plaintiff's share is $174. The court expects the total child care expense to change over time, and that the defendant's obligation shall be adjusted accordingly consistent with this order.
4. The defendant shall pay alimony to the plaintiff in the amount of $115 per week for a period of five years or until the death of either party or remarriage of the plaintiff. The term of this obligation shall be nonmodifiable.
5. The parties shall each be entitled to take one of the children as a dependency exemption for taxation purposes. The parties shall alternate the dependency exemption for the third child with the plaintiff having the even years and the defendant having odd years. The defendant shall only be able to use his dependency exemptions if he is current in his child support payments on December 31 of the year for which the exemptions are claimed.
6. The defendant shall maintain medical insurance for the benefit of the minor children as available through the place of his employment. In accordance with the Guidelines, the plaintiff shall pay the first $100 per year per child for unreimbursed medical, dental, and orthodontic expenses for the minor children, and the parties shall split the expenses in excess thereof 38% to the defendant and 62% to the plaintiff.
7. The defendant shall maintain insurance policies with death benefits totaling at least $175,000 naming the plaintiff as beneficiary until his child support obligation has been paid in full. Insurance in excess of this amount is available through his employer at no cost.
8. The defendant shall forthwith quitclaim to the plaintiff all of his right, title, and interest in the jointly owned real property at 25 Newport Avenue, West Hartford, Connecticut. The plaintiff shall assume, pay and hold the defendant harmless from the mortgage owed on the premises in the amount of $65,344. In consideration for this conveyance, the plaintiff shall forthwith tender to the defendant her promissory note in the amount of $60,195, which shall be secured by a second mortgage from the plaintiff to the defendant on the premises at 25 Newport Avenue, West Hartford, Connecticut. The note shall accrue simple interest at the rate of 3% per year, and shall be due and payable upon the first happening of the following events: the plaintiff's death, the plaintiff's remarriage, or one year from the date of this judgment. The plaintiff's counsel shall prepare the mortgage deed and note, and the defendant's counsel shall prepare the quitclaim deed. The parties are ordered to properly execute CT Page 11131 all documents necessary to effectuate these orders.
9. The plaintiff shall be the sole owner of the 2000 Mazda van free and clear of any claims of the defendant. The defendant shall be the sole owner of the 1991 Nissan sedan free and clear of any claims of the plaintiff. The parties shall cooperate in the completion of any paperwork necessary to transfer the titles and registrations of these vehicles.
10. The defendant shall be the sole owner of the joint Fidelity portfolio, all savings bonds in the name of the defendant, the Kaman stock whether jointly or solely owned, and the American Eagle Credit Union Savings Account. The defendant shall own these assets free and clear of the claims of the plaintiff.
11. The plaintiff shall be the sole owner of the jointly owned savings bonds free and clear of the claims of the defendant.
12. The parties shall each retain ownership of any savings or checking accounts titled in their sole names. They shall own these assets free and clear of the claims of the other.
13. The parties shall each retain ownership of their IRA's, 401k's, and profit sharing plan, free and clear of the claims of the other.
14. The plaintiff's pension with Massachusetts Mutual and the defendant's pension with Kaman are to be equalized by Qualified Domestic Relations Orders. The court shall retain jurisdiction for the purposes of effectuating this equalization.
15. The parties shall divide all of their personal property on an equal basis. If a disagreement arises, the parties are ordered to mediate their differences with Family Services prior to filing any motions with the court.
16. Each party shall be solely responsible for the debts shown on their respective financial affidavits and shall indemnify and save the other party harmless from liability for the same.
17. The parties shall pay their own counsel fees.
BY THE COURT
________________ Pickard, J. CT Page 11132